## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Case No. 13-3398-PWG** |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MELINA ALI,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

### SUPPLEMENTAL RESPONSE BRIEF OF RESPONDENT MELINA ALI

Respondent Melina Ali submits this Supplemental Brief in response to the Government's Supplemental Brief in Support of its Petition to Enforce Summons. For the reasons that follow, the Court should quash and deny enforcement of the IRS summons directed to Respondent.

### INTRODUCTION

The IRS is improperly using its summons power to gather discovery against Respondent for use in the impending criminal case it intends to bring against her. While the IRS continues to maintain in its filings with this Court that it has not decided to charge Respondent with a criminal offense, the facts, circumstances, and conduct of the IRS during the last two years presents a highly plausible inference to the contrary – that the present summons has been issued for a prohibited purpose and in bad faith. Accordingly, Respondent respectfully requests that this Court grant a limited evidentiary hearing to examine the IRS's representative (specifically Revenue Agent Brimage) regarding the purpose for the summons. Even if the Court finds the Government's purpose to be permissible, the Fifth Amendment protects Respondent from being compelled to produce documents or provide additional testimony.

## STATEMENT OF THE FACTS

The IRS has been investigating Respondent Melina Ali for close to two years. *See* Declaration of Sonali Patel, Esq., Exhibit 1 hereto, ¶6. Over the course of that time, the IRS has issued summonses to Ms. Ali, her attorney, and fourteen different third parties. Exh. 1, ¶8.

The summons at issue here seeks documents and information dating back more than a decade, to 2004. *See* Summons, Exh. E to the Government's Supplemental Brief (Supp. Br.). As the summons and affidavits filed in this case indicate, the investigation of Ms. Ali is being conducted by IRS Revenue Agent Gladys Brimage. *See* Supp. Br. Exh. E & Doc. 19-4. In written communications, Ms. Brimage identifies her title as a "Certified Fraud Specialist, Special Enforcement Program." *See* Exh. 1, ¶10.

### The SEP's Mission to Develop Criminal Prosecutions

Ms. Brimage is a member of the IRS's so-called Special Enforcement Program (SEP). *See* Doc. 19-4, ¶1. According to the IRS Manual, the SEP is designed to target criminal tax matters: "SEP is a specialized compliance program within the Small Business/Self- Employed Operating Division (SB/SE) directed toward that segment of the population which derives substantial income from either legal or illegal activities and intentionally understate their tax liability." IRS Manual §4.16.1.1 (06-14-2011), Exhibit 2 hereto.

"SEP evolved from a Strike Force program focused on organized crime and illegal activity into a compliance program with emphasis on identifying, developing and investigating fraudulent income and expense issues of both legal and illegal entities." *Id*., ¶2. Its goal is "maximum deterrence," which results from "examining those cases which significantly impact the public and assisting in the investigation and prosecution of prominent or notorious individuals who attempt to evade or defeat the tax system." *Id*., ¶3.

The "core roles and responsibilities of SEP" are geared toward criminal prosecution, including, among other things: (1) identifying and developing issues that "have <u>significant fraud</u> potential;" (2) assisting in investigating "taxpayers who derive legal and illegal income, but <u>choose to</u> evade their tax liability through one or more violations of the tax law;" (3) serving as cooperating agents in <u>grand jury</u> investigations; and (4) providing "trial assistance as either expert and/or summary witnesses in <u>criminal prosecutions</u>." *See* Exh. 2, IRS Manual §4.16.1.2 (06-14-2011), ¶1 (emphasis added). The types of cases handled by the SEP are also generally criminal in nature, focusing on fraud, organized crime, corruption, prostitution, embezzlement, and the like. *Id*., ¶3.

In contrast to the mandates of other IRS agents, who have discretion on the issue, the mandate of SEP agents requires them to refer for prosecution all cases in which criminal violations are found. Exh. 2, IRS Manual §4.16.1.3.1 (E) (06-14-2011) (stating that SEP agents must "[s]ubmit referrals to CI [criminal investigation] on cases meeting criminal criteria.").

The government has been engaged in ongoing efforts to investigate and prosecute taxpayers with unreported holdings in overseas bank accounts. Its efforts have focused most particularly on holders of bank accounts with Swiss bank UBS AG, which revealed the names of account holders in a settlement with the government. *See United States v. UBS AG*, No. 09-60033-CR-COHN, Deferred Prosecution Agreement, Exhibit 3 hereto. In describing its post-settlement efforts with regard to UBS clients, the IRS's website documents dozens of criminal prosecutions, and no cases in which it only pursued civil enforcement. *See* "Offshore Tax Avoidance and IRS Compliance Efforts," Exhibit 4 hereto.

**The Government's Investigation of Respondent is Consistent with Its Institutional Focus on Prosecuting Taxpayers Who Fail to Disclose Foreign Accounts**

The IRS has been conducting amnesty programs, which allow taxpayers who voluntarily disclose their foreign bank accounts to escape with civil penalties and a greatly reduced chance of prosecution. In

announcing a new amnesty program in 2012, the IRS highlighted its "ongoing efforts with the Justice Department to pursue criminal prosecution of international tax evasion." IR-2012-5, Jan. 9, 2012 (available at http://www.irs.gov/uac/IRS-Offshore-Programs-Produce-$4.4-Billion-To-Date-for-Nation%E2%80%99s-Taxpayers;-Offshore-Voluntary-Disclosure-Program-Reopens). For taxpayers that the Government believes to have undisclosed overseas accounts but who have not taken advantage of the amnesty program, criminal prosecution is likely to follow.

The summons, and SEP's investigation of Ms. Ali more broadly, has focused on uncovering overseas bank accounts that the government appears to believe Ms. Ali holds. *See* Summons, Supp. Br. Exh. E. Foreign accounts were the focus extensive questioning of Ms. Ali during her IRS interview. *See* Transcript of Interview, Supp. Br. Exh. D, Doc. 19-9, at 163, 164, 172, 183, 196, 197, 199 & 224-233. Ms. Ali was specifically queried at length about whether she was a beneficiary of a UBS account. *See id.* at 224-228. Indeed, in its Supplemental Brief, the Government openly states its position that Ms. Ali is guilty of perjury for denying during her interview that she has an interest in a foreign bank account. Supp. Br. at 18, n. 8.

### The Response to Respondent's FOIA Request Reflects an Ongoing Criminal Investigation

On November 28, 2012, one of Ms. Ali's attorneys sent a Freedom of Information Act (FOIA) request to the IRS, asking for copies of all documents pertaining to Ms. Ali. The IRS responded with a letter stating that it had located 1,789 pages of documents responsive to the FOIA request, but that it was withholding the vast majority of them, including "8 pages in part and 1264 pages in full." *See* March 20, 2013 Correspondence from IRS to Sonali Patel, Esq., Exh. 5 hereto.

In the letter response, the IRS stated that 1203 of the 1264 pages being withheld in full were being withheld under 5 U.S.C. §552(b)(7), which shields from disclosure "records or information

compiled for law enforcement purposes…" *See* Exh. 5 at 1-2 (stating that 1023 pages were withheld under §552(b)(7)(A), 43 pages under (b)(7)(C), and 137 pages under (b)(7)(E)). Of those 1203 pages, 137 were withheld because they were "compiled for law enforcement purposes," and their disclosure would reveal "[t]echniques and procedures for law enforcement investigations or prosecutions," and "[g]uidelines for law enforcement investigations or prosecutions" that "could reasonably be expected to risk circumvention of the law" if released. *Id*. at 2.

An additional three pages of documents held by the IRS pertaining to Ms. Ali consisted of "inter-agency or intra-agency memorandums or letters" that included either attorney work product or attorney-client privileged information, or reflected "the predecisional opinions and deliberations that play a direct part in the process of making recommendations on legal or policy matter." *Id*.

### The Government's Interviews of Respondent

The Government has now conducted two in-person Examinations Under Oath of Respondent. Even at the first interview of Respondent, on June 3, 2013, the Government was represented by counsel, Lindsey D. Stellwagen. See Doc. 10-4 at 2. Reflecting the Government's focus on prosecuting Respondent for allegedly undisclosed foreign financial accounts, Ms. Stellwagen is Special Counsel International in the Office of Chief Counsel of the IRS.

In accordance with the Court's April 24, 2014 Order, Ms. Ali submitted to an in-person interview by on May 27, 2014. *See* Doc. 19-9. At the second interview, a Department of Justice trial attorney, Ms. Dickey, was present in addition to Ms. Stellwagen and two revenue agents. *See id*. at 2. The Government questioned Ms. Ali for 8 hours. *Compare* Doc. 19-9 at 284 (reflecting that the interview concluded at 5:36 PM) with Doc. 19-9 at 1 (reflecting that the interview began at 9:30 AM). Although Ms. Ali responded to numerous questions, she interposed her Fifth Amendment privilege

5

against self-incrimination when it appeared that the Government was attempting to elicit an incriminating (or potentially incriminating) response from her. *See generally* Doc. 19-9.

## ARGUMENT

This Court should deny the Government's Petition to Enforce the IRS Summons and grant Respondent's Motion to Quash. The Government is attempting to use the IRS administrative summons for the impermissible purpose of gathering evidence for the criminal prosecution of Ms. Ali that it is planning. At a minimum, a limited evidentiary hearing to examine Ms. Brimage should be ordered. In accordance with the Supreme Court's recent decision outlining the standard for when such a hearing is required, Respondent's evidence plausibly suggests that the IRS's purpose in serving the summons was to gather evidence for a planned criminal prosecution rather than for a civil purpose. Ms. Ali should be given the opportunity to question the IRS about its motives and prove that they are improper. Moreover, the information sought by the summons is potentially incriminating. As such, the Fifth Amendment protects Ms. Ali from responding to the summons.

I.   **THE SUMMONS IS UNENFORCEABLE BECAUSE THE GOVERNMENT IS UNLAWFULLY USING AN ADMINISTRATIVE SUMMONS TO GATHER INFORMATION FOR A CRIMINAL PROSECUTION**

Prior to considering whether the Fifth Amendment privilege applies to the individual document production requests and testimony, the Court should hold an evidentiary hearing to permit Ms. Ali to question the IRS about its motive in serving the summons. Since the Court's April 24, 2014 Memorandum Decision and Order was issued, the United States Supreme Court has clarified the standards that district courts must apply in evaluating whether to grant an evidentiary hearing in *United States v. Clarke*, No. 13-301, 2014 U.S. LEXIS 4304 (June 19, 2014).

Under the new standards articulated by the Supreme Court, "the taxpayer is entitled to examine an IRS agent when he can point to specific facts or circumstances plausibly raising an inference of bad faith." *Id*. at 11. And although the taxpayer must come forward with some evidence from which an improper motive can plausibly be inferred before a hearing is warranted, conclusive evidence is not necessary:

> Naked allegations of improper purpose are not enough: The taxpayer must offer some credible evidence supporting his charge. But circumstantial evidence can suffice to meet that burden; after all, direct evidence of another person's bad faith, at this threshold stage, will rarely if ever be available. And although bare assertion or conjecture is not enough, neither is a fleshed out case demanded: The taxpayer need only make a showing of facts that give rise to a plausible inference of improper motive.

*Id*. at 11-12.

There is sufficient circumstantial evidence here to warrant a hearing to give Ms. Ali the opportunity to question the IRS about whether the summons is intended to gather information for use in a criminal prosecution of Ms. Ali. A summons must be quashed whenever "the taxpayer can show that the IRS is attempting to abuse the court's process." *United States v. Stuart*, 489 U.S. 353, 360 (1989). And the taxpayer "'may challenge the summons on any appropriate ground.'" *Powell*, 379 U.S. at 57-58 (quoting *Reisman v. Caplin*, 375 U.S. 440, 449 (1964)).

The summons here should be quashed because it seeks information for use in a criminal prosecution. Section 7602(d) prohibits the IRS from issuing an administrative summons for the purpose of gathering information for a criminal prosecution. *Stuart*, 489 U.S. at 362-63. Although §7602(d) states only that an administrative summons is prohibited when a referral for prosecution has been made to the U.S. Department of Justice, that provision also makes a summons improper when the IRS is

attempting to "circumvent this requirement  by delaying such a recommendation in order to gather additional information." *Id*.

Thus, the "sole criminal purpose" doctrine "requires that the courts refuse to enforce summonses once the IRS has 'institutionally committed' itself to such a referral."  *Hintze v. IRS*, 879 F.2d 121, 127 n.8 (4th Cir. 1989), overruled on other grounds, *Church of Scientology v. United States*, 506 U.S. 9 (1992); *see also In re Subpoenas Duces Tecum,* 51 F. Supp. 2d 726, 734 (W.D. Va. 1999) ("The Fourth Circuit…has stated that a summons issued under 26 U.S.C.A. § 7602 violates the Fourth Amendment if the sole objective of the investigation is to obtain evidence for use in a criminal prosecution.").

As such, "interested parties may obtain an order quashing administrative summonses upon any showing that the IRS is pursuing the underlying investigation for the sole purpose of collecting evidence for use in a criminal prosecution." *Hintze*, 879 F.2d at 127 n.8 (citing *United States v. Theodore*, 479 F.2d 749, 753 (4th Cir. 1973)). The circumstances of the IRS's investigation of Ms. Ali make clear that the IRS is gathering information for a criminal prosecution of Ms. Ali, and that the summons unlawfully seeks information for use in that criminal prosecution.

*First*, the investigation is being conducted by a fraud specialist, and member of the SEP, a unit of the IRS that "evolved from a Strike Force program focused on organized crime and illegal activity," with a the stated mission to investigate intentional fraud and assist in "the investigation and prosecution of prominent or notorious individuals who attempt to evade or defeat the tax system." IRS Manual §4.16.1.1 (06-14-2011), Exhibit 2 hereto, ¶¶1-2. And the SEP is required to refer cases involving criminal violations for prosecution. *See* Exhibit 2, IRS Manual §4.16.1.3.1 (E) (06-14-2011).

*Second*, the SEP has focused much its investigation of Ms. Ali on alleged unreported overseas bank accounts, an area in which the government has offered amnesty for voluntarily disclosing

taxpayers, and targeted taxpayers that do not participate for criminal prosecution. Failure to disclose overseas bank accounts is a criminal violation. 31 U.S.C. §5322. As noted, SEP is required to refer criminal violations for prosecution. That the IRS is trying to build a case that Ms. Ali was a beneficiary of a UBS account specifically makes that intent even clearer.

*Third*, the IRS's response to Ms. Ali's FOIA request shows that as of more than one year ago, the IRS had already compiled more than 1,200 pages of documents "for law enforcement purposes," including 137 pages that could not be disclosed because they would reveal "[t]echniques and procedures for law enforcement investigations or prosecutions," and "[g]uidelines for law enforcement investigations or prosecutions" that "could reasonably be expected to risk circumvention of the law" if released. *See* Exh. 10 & 5 U.S.C. §552(b)(7).

Moreover, the IRS's response to Ms. Ali's FOIA request also suggests that more than one year ago, it had already consulted with the Department of Justice about Ms. Ali's case, resulting in its withholding documents based on an exemption to disclosure for privileged information.

*Fourth*, the summons seeks documents and information dating back far beyond the time period that would be at issue for a civil investigation. Under 26 U.S.C. §6501(a), "the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed…and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period." Thus, if the IRS's purpose was civil in nature, there would be no reason for the IRS to inquire about potential income that Ms. Ali may have earned more than three years ago, as it would be powerless to assess additional taxes even if it found unreported income.

The only exceptions to this statute of limitations that might motivate the IRS to seek information about time periods dating back more than three years all involve criminal liability, such as to investigate

whether Ms. Ali filed "a false or fraudulent return with the intent to evade tax;" engaged in a "willful attempt in any manner to defeat or evade tax imposed by this title;" or failed to disclose foreign bank accounts. *See* 26 U.S.C. §6501(c). Even if the IRS might believe that Ms. Ali understated her gross income by an extremely large amount—which itself would lead to criminal prosecution—that would only extend the statute of limitations to six years. 26 U.S.C. §6501(e). Thus, there would be no purpose for the IRS seeking documents and information dating back more than six years if the IRS's purpose was to gather information for civil enforcement. Yet the summons seeks documents and information dating back ten years.

Moreover, despite the IRS's conduct of a scorched earth investigation that has been ongoing since 2012, reaches back ten years, and has employed a multiplicity of summonses, the IRS has yet to assess any additional taxes on Ms. Ali for any time period.

Taken together, the combination of these circumstances—with a division dedicated to preparing criminal cases, the SEP, conducting a lengthy, no-holds-barred investigation; the investigation being focused on overseas bank accounts, an area in which the IRS is engaging in "ongoing efforts with the Justice Department to pursue criminal prosecution of international tax evasion;" the IRS stockpiling "law enforcement" documents regarding Ms. Ali and possession of privileged materials suggesting consultation with the Department of Justice; and the IRS pursuing documents that would only be pertinent to criminal enforcement—compel the conclusion that the IRS has made the institutional decision to refer Ms. Ali to the Department of Justice for prosecution.

Thus, because the summons seeks information for use in a criminal prosecution, it should be quashed in its entirety. The Court should order an evidentiary hearing to give Ms. Ali the opportunity to question the IRS about its motives in serving the summons.

## II.      THE FIFTH AMENDMENT PROTECTS MS. ALI FROM PRODUCING THE REQUESTED DOCUMENTS

Even if the IRS's purpose in serving the summons had been proper, the Fifth Amendment privilege against self-incrimination would protect Ms. Ali from being compelled to produce documents in response to the summons. "Whether there is a sufficient hazard of incrimination is of course a question for the courts asked to enforce the privilege." *United States v. Sharp*, 920 F.2d 1167, 1170 (4th Cir. 1990) (citing *Hoffman v. United States*, 341 U.S. 479, 486 (1951)). The first determination for the court is "whether the information is incriminating in nature." *Sharp*, 920 F.2d at 1170. Information should be found to be incriminating if its incriminating nature is either (1) "evident on its face, in light of the question asked and the circumstances of its asking;" or (2) "its incriminating potential" is made evident by "further contextual proof." *Id*.

If the information has incriminating potential, the court must determine "whether criminal prosecution is sufficiently a possibility, all things considered, to trigger the need for constitutional protection." *Sharp*, 920 F.2d at 1171. However, "the reasonableness of a claimed apprehension should simply be assumed once incriminating potential is found, unless there are genuine questions about the government's legal ability to prosecute." *Id*. In other words, if the information is potentially incriminating, the second consideration only comes into play if the Government is legally unable to prosecute:

> [O]nce incriminating potential is found to exist, courts should not engage in raw speculation as to whether the government will actually prosecute…and should only pursue that inquiry when there are real questions concerning the government's ability to do so because of legal constraints such as statutes of limitation, double jeopardy, or immunity.

*Id*. Moreover, that is especially true when an individual is being investigated by the IRS, "given the recognized potential that such investigations have for leading to criminal prosecutions." *Id*. at 1170. In

addition, as noted, the manner in which the investigation of Ms. Ali is being conducted, and its focus on foreign accounts, strongly suggests that the Government does intend to prosecute Ms. Ali.

The IRS has not offered any reason why Ms. Ali could not be prosecuted. Thus, the only real question for the Court here is whether the information requested by the Government is potentially incriminating.

As the Court recognized in its April 24, 2014 Memorandum Opinion and Order, in assessing whether the Fifth Amendment privilege against self-incrimination applies to the production of documents, there are two separate inquiries. Order at 10 (citing *United States v. Hubbell*, 530 U.S. 27, 36 (2000). The first inquiry is whether the contents of the documents themselves are privileged. *Hubbell*, 530 U.S. at 35-36. In regard to that inquiry, the contents of documents that were voluntarily created prior to the Government's issuance of a summons are generally not considered to be privileged because the documents' creation was not "compelled" by the Government. *Id*.

The second inquiry is whether the *act of producing* documents is testimonial and potentially incriminating. In contrast to the voluntary creation of documents, in responding to an IRS summons, "[t]he elements of compulsion are clearly present."  *United States v. Doe*, 465 U.S. 605, 613 (1984). As the Supreme Court has explained, "the act of producing documents in response to a subpoena may have a compelled testimonial aspect." *Hubbell*, 530 U.S. at 36. That is because "'the act of production' itself may implicitly communicate 'statements of fact.'" *Id*.

Statements of fact that the act of production might make include: (1) that the documents exist; (2) that the documents are in the respondent's possession or control; and (3) that the documents are authentic. *Hubbell*, 530 U.S. at 36. Production of documents could also communicate "the taxpayer's

belief that the papers are those described in the subpoena." *United States v. Doe*, 465 U.S. at 613 (quoting *Curcio v. United States*, 354 U.S. 118, 125 (1957)).

The Fifth Amendment extends not only to information that could be used in a criminal prosecution, but also to statements that could lead to other evidence that may be used in a criminal prosecution, or that would provide "a link in the chain of evidence." *See Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 190 (2004) ("[T]he Fifth Amendment privilege against compulsory self-incrimination 'protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.'") (quoting *Kastigar v. United States*, 406 U.S. 441, 445 (1972)); *United States v. Sharp*, 920 F.2d 1167, 1170 (4th Cir. 1990) ("And it applies not only to evidence which may directly support a criminal conviction, but to 'information which would furnish a link in the chain of evidence that could lead to prosecution, as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution.'") (quoting *Maness v. Meyers*, 419 U.S. 449, 461 (1975)).

For the reasons that follow, the information that would be conveyed by Ms. Ali's production of the documents requested by the Government would be potentially incriminating. As such, even if the Court determines that the summons is enforceable despite its criminal purpose, the Court should uphold Ms. Ali's Fifth Amendment right to refuse to testify against herself through the act of producing of requested documents.

### A. The Act of Producing Records of Foreign Financial Accounts Would Violate Respondent's Fifth Amendment Rights

The Government erroneously contends that the Fourth Circuit's decision in *United States v. Under Seal*, 737 F.3d 330, 333-37 (4th Cir. 2013)), controls the determination of whether Ms. Ali's Fifth Amendment rights would be violated by requiring her to produce records of foreign financial

accounts. Not so. As noted, in evaluating whether the Fifth Amendment privilege protects against being required to produce documents, there are two inquiries: (1) whether the contents of the documents are protected; and (2) whether the *act of production* is protected.

In *Under Seal*, the Fourth Circuit addressed only the former inquiry. The sole issue addressed by the court was the respondents' argument that the *contents* of the documents were privileged because their records of foreign accounts were not voluntarily created.   *Under Seal*, 737 F.3d at 333 ("Essentially, the Does argue that '[w]here documents are required to be kept and then produced, they are arguably compelled.'") (quoting *In re M.H.*, 648 F.3d 1067, 1071 (9th Cir. 2011); *cf. Hubbell*, 530 U.S. at 35-36 (noting that the contents of documents voluntarily created prior to the Government's issuance of a summons are not privileged because their creation was not "compelled" by the Government). The court of appeals rejected that argument, because under the required records doctrine, even if the Government compels the creation of documents, their contents are not privileged if they are required to be kept as part of a regulatory regime. *Under Seal*, 737 F.3d at 333-336.

But the separate issue of whether the act of producing the documents would itself be testimonial and protected by the Fifth Amendment was not addressed by the Fourth Circuit, likely because the respondents made no such argument. Thus, the decision in *Under Seal* is not dispositive of whether the act of producing the requested documents is protected by the Fifth Amendment.

The Court should find the act of production here is privileged. Items 1A and 2A require Ms. Ali to produce "any and all records required to be maintained pursuant to 31 C.F.R. §1010.420…relating to foreign financial accounts that you had/have a financial interest in…," including accounts maintained in names other than her own. 31 C.F.R. §1010.350 requires that taxpayers "having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country shall

report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists…" 31 C.F.R. §1010.420, in turn, requires that "[r]ecords of accounts required by § 1010.350 to be reported to the Commissioner of Internal Revenue shall be retained by each person having a financial interest in or signature or other authority over any such account" for five years.

Failure to either maintain such records or to report the transactions as required by the regulations is a crime. Under 31 U.S.C. §5322, "[a] person who willfully" violates reporting or recordkeeping requirements for foreign financial accounts may be subjected to criminal penalties.

According to the Government, it has information leading it to conclude that Ms. Ali was the beneficiary of a foreign bank account in 2003. Doc. 19-4, ¶9. Ms. Ali has not filed reports indicating that she has "a financial interest" in any foreign financial accounts during the period that is the subject of the summons, 2004-2011. Thus, if she had a financial interest in a foreign financial account, she could have potentially failed to comply with the reporting requirements of 31 C.F.R. §1010.350.

The act of production would be testimonial and could convey incriminating information about Ms. Ali. Items 1A and 2A are framed in terms of compliance with the regulations. Both regulations define their requirements by whether the taxpayer has "a financial interest" in a foreign account. Thus, producing documents would be an admission by Ms. Ali that she was required to keep records of foreign accounts, and accordingly that she was required to report transactions that she may not have reported. *See United States v. Doe*, 465 U.S. at 613 (noting that the act of production may communicate "the taxpayer's belief that the papers are those described in the subpoena."). That is especially true given that summons requires Ms. Ali to produce documents in her possession related not only to accounts held in her own name, but also to accounts that may be held in the names of persons other than Ms. Ali. Such

admissions could be used against Ms. Ali to show that she willfully failed to report financial interests in foreign accounts.

Producing such documents would also communicate that such documents exist, were received by Ms. Ali, and are within her possession or control. *See Hubbell*, 530 U.S. at 36 (noting that the act of production may convey that documents exist, are in the respondent's possession or control, or are authentic). The existence of such documents could certainly be used to prove that Ms. Ali has not filed reports as required. Her possession of such documents could be used to show that any failure to report foreign financial transactions was willful, in that Ms. Ali knew by virtue of the records that she held a beneficial interest. Moreover, Ms. Ali's mere receipt of such documents could also be used to show that she did, in fact, have a financial interest in the accounts.

Conversely, if Ms. Ali is required to respond to these items, she might convey incriminating information tending to show that she has violated the recordkeeping requirements of the regulations. If the Government were to obtain other evidence tending to show that Ms. Ali had a financial interest in accounts such that she was required to maintain such records, and Ms. Ali does not produce such records in response to the summons, Ms. Ali's act of production would admit that she is not in possession of required records. That admission could be used against her to prove that she violated the recordkeeping requirements of the regulations.

For all of these reasons, the act of producing documents in response to Items 1A and 2A would be testimonial and potentially incriminating. As such, the Court should find the Fifth Amendment privilege protects Ms. Ali from responding to those items.

**B.  Production of Respondent's Bank Account Documents Is Privileged**

Items 1C-1H and 2B of the Summons request additional information about foreign financial accounts that are the subject of Items 1A and 2A. Thus, the Fifth Amendment shields against being compelled into the act of producing documents in response to these items for much the same reason that it protects against producing the records required to be kept under 31 C.F.R. §1010.420. Simply put, the act of producing such documents would convey that Ms. Ali received information about such accounts, tending to show that she is a beneficiary of such accounts, and her possession of information about such accounts would tend to show that she acted willfully in not reporting financial interests in such accounts.

These Items additionally request information about Ms. Ali's domestic bank accounts. But the act of production of such information is also protected by the Fifth Amendment. During the time period at issue, Ms. Ali reported extremely modest income. For example, in 2011, Ms. Ali reported an adjusted gross income of $-2,555.00, include interest income of $223.00, dividend income of $222.00, and a capital loss of $3000.00. *See* Exh. 6 hereto.

If the documents that Ms. Ali is compelled to produce reflect income that was not reported by Ms. Ali, producing such documents would convey information tending to show that Ms. Ali had knowledge that she underreported her income or fraudulently reported it. The Internal Revenue Code is rife with potential criminal sanctions for willfully failing to report or pay taxes as required by law. *See, e.g.*, 26 U.S.C. §7201 ("Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony…"); *see also* 26 U.S.C. §§7202-7217 (specifying other tax related crimes).  If Ms. Ali is in possession of documents reflecting unreported income, by producing such documents, she would be

providing testimony suggesting that she willfully attempted to evaded taxes. Ms. Ali's act of production would, thus, communicate potentially incriminating information about Ms. Ali.

Citing *Mitchell v. United States*, 526 U.S. 314, 321 (1999) and *Caminetti v. United States*, 242 U.S. 470, 494 (1917), the Government erroneously contends that Ms. Ali has waived the privilege as to any information about her domestic bank accounts. Neither *Mitchell* nor *Caminetti* remotely supports that assertion. In both cases, the Supreme Court did no more than restate the rule that in the interest of not misleading the factfinder, once a witness chooses to voluntarily testify on direct examination without invoking the privilege, she cannot refuse to answer questions on cross examination on the same subject matters as were covered on direct examination. *Mitchell*, 526 U.S. at 321-322; *Caminetti*, 242 U.S. at 494. That is not remotely the situation here. Ms. Ali did not choose to testify at trial on direct examination. She was merely compelled to testify at an IRS interview by virtue of the summons and the Court's order. The entire proceeding was equivalent to cross examination, as she was solely questioned by the adverse party. And there was no factfinder to mislead. Indeed, Ms. Ali's out of court testimony is hearsay that would be inadmissible in court.

The holding in *Mitchell* actually contravenes the Government's waiver argument. In that case, the Supreme Court held that even though a defendant has pled guilty, admitting incriminating facts in the plea agreement and at the plea colloquy, the privilege is not waived as to any additional incriminating information, including the circumstances and details of the crime, about which he or she may be asked to testify at sentencing. 526 U.S. at 324-325. That is because, contrary to the Government's contention, even when a respondent has voluntarily answered some questions without invoking the privilege, the Court must still evaluate whether additional questions would be further incriminating. *See Rogers v. United States*, 340 U.S. 367, 374 (1951) ("As to each question to which a

claim of privilege is directed, the court must determine whether the answer to that particular question would subject the witness to a 'real danger' of further crimination."). As such, the Government's waiver argument fails.

Moreover, the Government's waiver argument is a non-starter, because whatever testimony Ms. Ali may have given during the interview, the Government has failed to show that she gave any testimony *incriminating* herself. As the Fourth Circuit has explained, where a witness has not offered testimony that amounts to "'an admission of guilt or incriminating facts, he is not deprived of the privilege of stopping short in his testimony wherever it may tend to incriminate him.'" *In re Hitchings*, 850 F.2d 180, 181 (4th Cir. 1988) (quoting *McCarthy v. Arndstein*, 262 U.S. 355, 359 (1923)). Thus, because the Government can point to no incriminating testimony by Ms. Ali on the subjects on which it seeks information, Ms. Ali cannot have waived her privilege against self-incrimination.

Indeed, the fact that Ms. Ali gave testimony about some aspects of her domestic accounts makes the Government's request for documents even more potentially incriminating. To the extent that Ms. Ali produces documents that contradict her testimony, her act of production would convey additional statements of fact that could potentially be used against her. Namely, her possession of documents containing information that is inconsistent with her testimony could be used to show that Ms. Ali willfully testified falsely during the interview. Thus, the fact that Ms. Ali testified about domestic accounts during the interview, far from waiving her Fifth Amendment privilege, actually makes her claim to the privilege even stronger.

The Government also contends that under the foregone conclusion doctrine, Ms. Ali should be compelled to produce a subset of the documents it has requested, namely account statements and applications with respect to Ms. Ali's domestic accounts at Citibank, Citigroup, Fidelity, and Sun Trust.

But whether or not the Fifth Amendment privilege applies to the production of such documents, the Government is not entitled to enforcement of the summons with respect to those items for a different reason: because the Government has not shown that it does not already have these documents. *See Conner v. United States*, 434 F.3d 676 (4th Cir. 2006) (noting that to enforce a summons, the Government must show, among other things, that "the information sought is not already in the possession of the IRS"). In late March 2014, the IRS served summonses on Citibank, Citigroup, Fidelity, and Sun Trust for the same documents. *See* Exhs. 7, 8, 9, & 10 hereto. Thus, the IRS should already have the requested documents in its possession. As such, the IRS is not entitled to enforce a summons to compel Ms. Ali to produce them.

### C. The Fifth Amendment Privilege Protects Against Production of Documents Related to Corporate Bank Records and "Structures"

Ms. Ali should not be compelled to produce information about corporate bank records or domestic and foreign structures. The act of producing such documents would be testimonial and could convey potentially incriminating information.

Producing information about structures would be potentially incriminating for the same reasons as set forth in Section II.A. and II.B. above. The summons asks for documents about structures in which Ms. Ali held a financial interest. By producing documents in response, Ms. Ali would be conveying her "belief that the papers are those described in the subpoena." *United States v. Doe*, 465 U.S. at 613. In other words, she would communicate an admission that she has a financial interest in such accounts. As noted, Ms. Ali has not reported holding financial interests in foreign accounts, so her testimony to the contrary would be potentially incriminating. She also did not report income from domestic structures. So any testimony by Ms. Ali that she did in fact have such financial interests in structures or income from them would be potentially incriminating.

And producing such documents would also communicate that such documents exist, were received by Ms. Ali, and are within her possession or control. *See Hubbell*, 530 U.S. at 36 (noting that the act of production may convey that documents exist, are in the respondent's possession or control, or are authentic). The act of production would thus convey information tending to show that Ms. Ali, in fact, held such financial interests, and that Ms. Ali was aware of such holdings but failed to report them.

Nor should Ms. Ali be compelled to produce documents concerning Richtree Corporation, While Pearl Investment Company, or other unspecified corporations. The act of producing such information would be testimonial in conveying that Ms. Ali is possession of such documents. And it would be potentially incriminating. Ms. Ali did not report business income during the relevant time period. *See* Exh. 6, line 12 & Doc. 19-6 (2006 Form 1040), line 12. So to the extent the information produced reflects unreported or underreported income, Ms. Ali's possession of such documents would tend to show that she knowingly, i.e., willfully, failed to report or underreported her income.

Moreover, to the extent that the Government seeks documents about corporations other than Richtree and White Pearl, Ms. Ali's production of documents in response to the summons would convey her "belief that the papers are those described in the subpoena." *United States v. Doe*, 465 U.S. at 613. In other words, the act of producing records for corporations other than Richtree and White Pearl would convey that Ms. Ali believes she has ownership interests in corporations that have not been reported. As such, the Fifth Amendment protects against compelling Ms. Ali to engage in the act of producing such documents.

The Government offers no argument as to why Ms. Ali should be compelled to produce documents relating to structures. With respect to corporate documents, the Government contends only that "the contents of corporate records are not privileged." Supp. Br. at 10. Even if that may be true,

however, that the contents may be not privileged does not change the fact that the act of production is still privileged for the reasons set forth above.

And despite the Court's direction in its Memorandum Decision and Order, the Government has made no showing that Ms. Ali may hold corporate account records in the capacity of a corporate officer. Notably, the summons is directed to Ms. Ali personally, not to the corporations, to which the Government has served separate summonses. Any documents held in a corporate capacity would be the subject of those summonses, not of the summons sent to Ms. Ali individually. Moreover, as the Government's own exhibits show, Ms. Ali is no longer a corporate officer of Richtree. *See* Doc. 19-7 at 20 (reflecting that Melina Ali should be deleted as a corporate officer of Richtree). Thus, by definition, any documents related to that entity that may presently be in her possession could not be held in the capacity of a corporate officer.

### D. The List Of Accounts That Ms. Ali Created For Her Attorney Is Protected By Both The Attorney-Client And Fifth Amendment Privileges

In Item 1.B., the summons seeks "[t]he list you gave to Sonali Patel and/or JG Tax Group of your foreign bank accounts." As the Court is aware, Sonali Patel is an attorney who represents Ms. Ali and JG Tax Group works with Ms. Patel in that representation.

As the Supreme Court has expressly held, a taxpayer may not be compelled to produce privileged information, as "the obligation imposed by a tax summons remains 'subject to the traditional privileges and limitations.'" *Upjohn Co. v. United States*, 449 U.S. 383, 398, 101 S.Ct. 677, 687 (1981) (quoting *United States v. Euge*, 444 U.S. 707, 714 (1980)). That includes the attorney-client privilege. *Fisher v. United States*, 425 U.S. 391, 403 (1976).

By its own definition, the document sought in Item 1.B. is attorney-client privileged. The privilege applies:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997) (quoting 8 John Henry Wigmore, Evidence in Trials at Common Law § 2292 (John T. McNaughton rev. 1961)).

Ms. Patel is an attorney. She is representing Ms. Ali in connection with IRS's investigation, with the assistance of Ms. Patel's investigative body, JG Tax Group. Exh. 1 ¶3. Ms. Ali created a list of accounts for the purpose of the representation and sent it to Ms. Ali's investigator for the purpose of Ms. Patel's representation of Ms. Ali in the IRS's investigation. *Id*. ¶4. The list was made in confidence. *Id*. ¶5. Ms. Ali has insisted that the list be held in confidence and may not be disclosed by either Ms. Ali or Ms. Patel. *Id*. Ms. Ali has not waived the privilege by showing the list to anyone other than her counsel. *Id*. As such, it is protected by the attorney-client privilege.

The Fifth Amendment also protects against the act of producing the list. The act of producing the list would be testimonial and potentially incriminating. Producing the list would convey Ms. Ali's possession of it, and thus, could be used to show Ms. Ali's knowledge that she had financial interests in accounts that she did not report and income she did not disclose.

The Government erroneously contends that the authenticity of the list "is a foregone conclusion" because the IRS supposedly "has other avenues available to authenticate the document." Supp. Br. at 12. According to the Government, the list could be authenticated because it supposedly has information leading it to believe that Ms. Ali was at one time "the beneficial owner of a foreign bank account." *Id*. As an initial matter, the list might contain information about accounts other than the one about which the Government says it has information. As such, the foregone conclusion doctrine does not apply. *See*

23

*United States v. Norwood*, 420 F.3d 888, 895 (8th Cir. 2005) (noting that the foregone conclusion doctrine does not apply to information about accounts that are outside of the Government's knowledge).

In addition, the Government's argument confuses corroboration with authentication. With exceptions not applicable here, only the person who prepares a document may authenticate it. *Fisher*, 425 U.S. at 413. Without the authenticating testimony of the document's creator, a document is not admissible in evidence. *Id.* Thus, absent testimony by Ms. Ali, the list's creator, the document's authenticity for evidentiary purposes is not a foregone conclusion. The act of producing the document would, thus, be testimonial and potentially incriminating by authenticating the list. For this additional reason, the Fifth Amendment protects against compelling Ms. Ali to produce the list.

### III.   THE FIFTH AMENDMENT PROTECTS MS. ALI FROM BEING COMPELLED TO GIVE ADDITIONAL ORAL TESTIMONY

The application of the Fifth Amendment with respect to the oral questioning of Ms. Ali is more straightforward. The only question in whether the statements that the Government seeks to elicit from Ms. Ali would be potentially incriminating.

The Government faults Ms. Ali for not stating on the record the reasons why responding to each of the questions asked was potentially incriminating. But it has cited no authority for the proposition that an explanation must be made on the record. To the contrary, as noted, whether the Fifth Amendment privilege applies is a question to be presented to and decided by the court asked to enforce the privilege, not the Government at the time of questioning. *Sharp*, 920 F.2d at 1170. And, of course, it would have been impossible for Ms. Ali to have articulated on the record why responses would be incriminating without incriminating herself through her explanation.

Information will be found to be potentially incriminating where its incriminating nature is either (1) "evident on its face, in light of the question asked and the circumstances of its asking;" or (2) "its

incriminating potential" is made evident by "further contextual proof." *Id*. And, as noted, the information need not be directly incriminating, for the Fifth Amendment privilege also applies to statements that could lead to other evidence that may be used against the witness, or that would provide "a link in the chain of evidence."

The circumstances here indicate that Ms. Ali has strong reasons to fear prosecution. They include, among other things, that the questioning occurred in the context of an IRS investigation, which has "the recognized potential…for leading to criminal prosecutions," and even more so in this case given that the investigation is being conducted by a member of the SEP, whose mission is tied to preparing criminal prosecutions, and that the investigation has focused on foreign bank accounts, which have been an area in which the Government has concentrated its efforts to obtain criminal convictions for those not participating in its amnesty programs, as well as other potential criminal violations. And the IRS has dedicated many resources to the investigation, which has been ongoing for almost two years. Thus, the circumstances give every indication that the Government is seeking incriminating information to use against Ms. Ali in a criminal prosecution.

Moreover, given the broad scope of potential criminal penalties related to tax reporting, a large number of questions can be potentially incriminating. In this context, as demonstrated below, Ms. Ali properly invoked her Fifth Amendment Rights with respect to each of the questions that she refused to answer.

### A. Questions Concerning Ms. Ali's Income Are Potentially Incriminating

All but one of the categories of invocations of the Fifth Amendment privilege with which the Government takes issue relate to information about Ms. Ali's income.  As noted, under 26 U.S.C. §7201, Ms. Ali can be prosecuted for any willful attempt to evade paying taxes, including failing to

report or underreporting her income. Thus, as the Court observed in its Memorandum Opinion and Order, "the Government seeks to ask Ali about the contents of her income tax returns and the information on which they are based. It readily is apparent that this information has the potential to incriminate her if she has not accurately or honestly stated her income or other information in her filed returns…" Order at 9.

### 1.   Gifts, Inheritances, and Non-Taxable Items (Questions 1-6)

The Government contends that information about gifts and inheritances is not potentially incriminating because a taxpayer need not pay taxes on such income. Yet, at the same time, the Government acknowledges that Ms. Ali could only avoid criminal liability if she received "valid" gifts or inheritances. Testimony on such issues is potentially incriminating, could lead to incriminating evidence, and could furnish a link in the chain of evidence.

First, it is potentially incriminating because testimony about gifts or inheritances that were not reported could lead to prosecution for not reporting such income if it is determined that the gifts were not "valid" such that she was not required to pay income tax on their receipt. Second, a gift or inheritance could be derived from illegal income, the receipt of which could also subject Ms. Ali to potential criminal liability. Testifying to her receipt of such income would thus be potentially incriminating.

Third, the inheritance question specifically relates to whether Ms. Ali inherited cigarette businesses in Indonesia. To the extent that Ms. Ali inherited businesses, they would be likely to generate income, and Ms. Ali could be prosecuted for failing to report such income. And the Government admits that Ms. Ali could be prosecuted for failing to report ownership interests in foreign businesses, as well as the fact that the statute of limitations has not run to the extent that Ms. Ali owned such business

interests in 2011. Moreover, if Ms. Ali were to admit that she owned foreign business interests outside of the statute of limitations, that testimony could lead to evidence that Ms. Ali still owned such interests within the statute of limitations, which were not reported. Thus, by testifying that she inherited such businesses, Ms. Ali would be providing incriminating testimony that could be used to show that she committed a crime in failing to report income.

### 2. Questions Related to Property Ownership (7-30)

The Government contends that there is no incriminating potential to testimony about Ms. Ali's ownership of property because she would not necessarily derive income from such property. As an initial matter, to the extent that Ms. Ali testified that she did own property, that testimony would be a link in the chain to show that she did derive income from any such property, and used to show that she did not report income.

More important, what the Government ignores is that all of the "property" questions also bear on Ms. Ali's income. Indeed, some of the questions explicitly ask such things as "How did you pay for" particular pieces of property. *See, e.g.*, questions 9 & 11. If Ms. Ali were to testify to ownership of property of substantial value that could not possibly be afforded by someone with the level of income she has reported, that testimony could be used to show that Ms. Ali knowingly did not properly report her income to the IRS. Thus, because testimony about Ms. Ali's property could be incriminating both as to unreported income from such properties and as to the accuracy of Ms. Ali's reporting of her income, it is potentially incriminating.

In fact, the Government admits that questions about the source of property (questions 41-55) are potentially incriminating. Supp. Br. at 17. But the Government ignores the fact that the answer to a question need not give direct evidence of the commission of a crime to be incriminating. Furnishing a

link in the chain is enough to make a statement incriminating. And admitting to making large purchases that would not be affordable by a person with Respondent's reported income would provide such a link, and could lead to other evidence that could be used to directly show that income was unreported, and a crime committed.

### 3.   Questions About Loans Given and Received (Questions 31-40)

The Government overlooks the obvious implications of testimony regarding giving and receiving loans. Testimony about loans received is directly related to income and property acquisition. If Ms. Ali testifies that she did not receive any loans, yet purchased property of substantial value that exceeded what she should have been able to purchase based on her reported income, that testimony would tend to show that Ms. Ali has not properly reported her income. Moreover, to the extent that Ms. Ali may have received loans from a foreign source, she may have been required to report the transaction. And to the extent that Ms. Ali may have received a loan from a person involved in criminal activity, testimony about receiving a loan from that person could implicate Ms. Ali as an associate and accomplice. Thus, testimony about receiving loans is potentially incriminating and protected by the Fifth Amendment.

Testimony about loans given would similarly be potentially incriminating for much the same reasons as testimony about property acquisition. If Ms. Ali testified that she had sufficient funds to make loans to others, particularly if the loans were large, that testimony could tend to show that Ms. Ali had more assets than a person with the level of income she has reported could possibly have on hand. As such, it could be used to show that Ms. Ali has not properly reported her income.

### 4.   Sources of Property (Questions 41-55)

Even the Government must admit that responding to its questions about the source of Ms. Ali's property and wealth would be potentially incriminating. Supp. Br. at 17. That is certainly true, for as the

Court has recognized, Ms. Ali would face criminal liability if she reveals income that has not been reported, such that questioning her about the accuracy of her reporting is potentially incriminating.

Without citation, the Government erroneously contends that Ms. Ali must show that "she is facing unique circumstances whereby she will risk incrimination." *Id*. What the Government really wants is to deny Ms. Ali the benefit of the Fifth Amendment by forcing her to justify invoking the Fifth Amendment by revealing what the incriminating testimony would be. There is no authority for requiring her to do so. To the contrary, the risk of incrimination is evaluated based on the questions posed and the circumstances of the inquiry, not based on what the answer to the question would be. *See Sharp*, 920 F.2d at 1170.

The inquiry here is in the context of an IRS investigation with strong criminal overtones and the questions relate to the accuracy of Ms. Ali's reporting of income. Answering such questions poses the risk of incrimination. The Fifth Amendment requires no more. Invoking its protection does not require a showing of unique circumstances. It is sufficient that by answering the Government's questions, Ms. Ali would be in danger of being a witness against herself.

### 5. Business Income (Questions 56-175)

Questions relating to Ms. Ali's interests in and income from businesses is potentially incriminating for the same reason as other income questions: if Ms. Ali responds to these questions by revealing income that has not been reported, her testimony could be used against her to prove she is guilty of tax evasion. And these questions are not limited to domestic corporate interests. Thus, Ms. Ali's responses would also be potentially incriminating to the extent that she is required to disclose unreported interests in foreign corporations.

The Government erroneously argues that responding to such questions would not be potentially incriminating—despite that Ms. Ali has reported no business income—because not all businesses generate income. But many do. And the Fifth Amendment does not only protect against being compelled to make statements directly implicating oneself, but also against being compelled to give testimony that could provide a link in the evidentiary chain or that could lead to other evidence that is directly incriminating. Any testimony about the affairs of any corporation from which Ms. Ali has not reported income could be used against her to show her knowledge of and involvement with the corporation. Such testimony could be used as a link in the chain of proving that Ms. Ali derived income from corporations with which she was involved, and willfully failed to report it.

### 6.   Accuracy of Income Tax Reporting (Questions 176-215)

The Government tacitly admits that Questions 176 to 215 directly question the underlying bases for the income reported by Ms. Ali. As this Court has already recognized, such questions have the inherent potential to be incriminatory. Indeed, such questions have an extremely strong potential for forcing Ms. Ali to incriminate herself. Any failure to accurately report income could lead to criminal charges. As such, Ms. Ali is entitled to invoke the Fifth Amendment privilege. She is not required to reveal what the contents of her incriminatory statements would be in order to invoke the privilege against giving such statements.

### 7.   Structured Accounts (Questions 216-223)

Compelling Ms. Ali to respond to questions about interests in structured accounts would be incriminatory for similar reasons. To the extent that Ms. Ali possesses such interests, she would likely have earned income from them. Forcing her to testify about those interests could thus incriminate her for failing to report that income. Moreover, to the extent that Ms. Ali holds interests in foreign structures,

requiring her to testify about them would be further incriminating because Ms. Ali has not reported holding interests in such structures. Thus, the Fifth Amendment protects Ms. Ali from being compelled to testify about structured accounts.

### B. Responding to Questions About Unreported Foreign Bank Accounts Would Be Potentially Incriminating

In addition to being potentially incriminating as relating to potential unreported sources of income, responding to questions about foreign financial accounts would also be potentially incriminating because Ms. Ali has not reported holding interests in such accounts. As noted, the failure to report such interests would in itself expose Ms. Ali to criminal liability. In fact, the Government tacitly acknowledges its own belief that compelling Ms. Ali to testify would be potentially incriminatory, based on its assertion that Ms. Ali held an unreported interest in a foreign bank account.

In the face of this evident incriminating potential, the Government contends that Ms. Ali should nonetheless be compelled to give testimony because she purportedly waived the privilege. But as noted in Section I.B. above, there has been no such waiver. As explained there, waiver can only occur to permit cross examination of a witness who has voluntarily offered testimony on direct examination at trial. Otherwise, the Fifth Amendment privilege may be invoked as to any statement that would be additionally incriminating.

As also noted, even when a witness can be compelled to answer questions on cross-examination based on her direct testimony, no waiver can occur unless the witness has given *incriminatory* testimony on the subject at issue. By contrast, the Government contends that Ms. Ali has waived the privilege by making a statement that does not incriminate her on the subject matter. Ms. Ali testified that she does *not* hold an interest in a foreign bank account. The Government's argument that this statement is incriminatory is nonsensical. Whether or not it might be incriminatory for the purpose of showing

perjury, it is exculpatory on the issue of whether Ms. Ali held unreported interests in foreign accounts. As such, under binding precedent, it could not have waived Ms. Ali's Fifth Amendment privilege against being a witness against herself on the issue of her reporting of foreign bank accounts.

In a final show of desperation, the Government urges the Court to limit Ms. Ali's Fifth Amendment rights because enforcing them would supposedly frustrate the IRS's mission. But there is no merit to the Government's argument that a taxpayer should be limited in her ability to invoke the Fifth Amendment because it would supposedly frustrate Congress's intent in granting broad investigative authority to the IRS. The Fifth Amendment is a constitutional right, which overrides any statute to the contrary. Whatever statutory powers the IRS might possess to gather information, it must gather that information in a manner that does not compel the taxpayer to become a witness against herself.

If the Government was truly concerned that its tax collection mission would be frustrated by Ms. Ali's invocation of the Fifth Amendment, the Government could simply grant Ms. Ali immunity from prosecution and obtain her full testimony. Its unwillingness to do so only further reflects true intent of the Government's investigation—to gather evidence for a criminal prosecution of Ms. Ali.

## CONCLUSION

Because the summons was served for the impermissible purpose of gathering information for a criminal prosecution, the Government's Petition to Enforce should be denied and Respondent's Motion to Quash should be granted. At a minimum, in accordance with *Clarke*, because Ms. Ali has come forward with evidence plausibly suggesting that the IRS has made the institutional decision to refer Ms. Ali for prosecution, the Court should order a limited evidentiary hearing to allow questioning the IRS as

to its motives. Moreover, even if the Court determines the purpose of the summons to be proper, the Court should deny enforcement of the summons so that Ms. Ali is not compelled to be a witness against herself in violation of the Fifth Amendment. The Government's petition to enforce the summons should be denied, and Ms. Ali's petition to quash the summons should be granted.

Respectfully submitted,

_____/s/_____
Michael S. Rothman
USDC MD Bar No. 14568
401 E. Jefferson, #201
Rockville, Maryland 20850
(o) : (301) 251-9660
(f) : (301) 251-9610
Email: mike@mikerothman.com

Sonali Patel
Fla. Bar No. 72299 (admitted *pro hac vice*)
1430 South Federal Highway, Suite 301
Deerfield Beach, Florida 33441
Phone: 404-375-3748
Email: sonali@jgtaxgroup.com

-and-

Daniel A. Bushell
Fla. Bar. No. 43442 (*pro hac vice* motion pending)
101 Northeast Third Avenue, Suite 1100
Fort Lauderdale, Florida 33301
Phone: 954-666-0220
Fax:    561-368-8403
Email: dan@bushellappellatelaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on 8th day of July, 2014, I caused a copy of the foregoing to be sent by the United States District Court CM/ECF electronic filing system to AUSA Melissa Dickey, United States Department of Justice, Tax Division in Washington, DC.

_____/s/_____
Michael S. Rothman