**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **United States of America,** | * | |
| **Petitioner,** | * | |
| **v.** | * | **Case No.: 8:13-cv-03398-PWG** |
| **Melina Ali,** | * | |
| **Respondent.** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

This Memorandum Opinion and Order addresses Ms. Melina Ali's request for the Court to return funds to her that she paid while in civil contempt of an Order to comply with an Internal Revenue Service ("IRS") summons.  In March 2016, I held Ms. Ali in contempt, but gave her a period of time to purge herself of the contempt before she would have to pay monetary sanctions of $500 per day.  To purge herself of contempt, Ms. Ali had to use "all reasonable efforts" to comply with the IRS summons.  Ms. Ali eventually paid these sanctions for almost three years, until I approved a joint stipulation in March 2019 that Ms. Ali purged her civil contempt and complied with the IRS summons.  ECF No. 78.  Shortly thereafter, Ms. Ali filed the pending motion for release of funds, asking the Court to return the monetary sanctions she paid on the basis that she actually purged herself of contempt before the sanctions started.  ECF No. 79.  Because Ms. Ali used all reasonable efforts to comply with the IRS summons before the sanctions started, her motion is granted.

**Background**

*IRS Summons and Contempt Order*

The long history of this case is summarized in my previous Memorandum Opinions and Orders issued on April 24, 2014, November 4, 2014, and March 29, 2016.[1]   In short, in November 2013, the United States of America filed a Petition to enforce an IRS summons served on Ms. Ali.  ECF No. 1.  The IRS was investigating Ms. Ali's income tax liability for the tax years 2004–2011 and whether to assess penalties for failure to report a foreign bank account under 31 U.S.C § 5314 and failure to file forms under 26 U.S.C. § 6677.  ECF No. 1 ¶ 5.  The IRS summons required Ms. Ali to produce documents and appear for testimony on June 3, 2013. *Id.* at ¶ 6.  On June 3, 2013 Ms. Ali appeared, but did not comply with the summons as she invoked her Fifth Amendment privilege against self-incrimination and did not produce the documents requested in the summons.  *Id.* at ¶ 9.  The United States sought to compel Ms. Ali to comply with the summons.  *Id.* at ¶ 11.

In November 2014, I ordered Ms. Ali to comply with the summons in part, finding the act of producing the documents sought by the summons would not require Ms. Ali to incriminate herself.  ECF No. 24.  The Order required Ms. Ali to produce records that related to foreign bank accounts and corporate records for domestic or foreign entities.  *Id.*

Despite my Order, Ms. Ali still did not produce the documents.  On March 29, 2016, I held a show cause hearing as to why Ms. Ali should not be held in contempt for failure to produce the foreign bank records and corporate records.  ECF No. 52 at 6:1–22.  Under relevant

---

[1] *See United States v. Ali*, No. PWG-13-3398, 2014 WL 1660280 (D. Md. Apr. 24, 2014); *United States v. Ali*, No. PWG-13-3398, 2014 WL 5790996  (D. Md. Nov. 5, 2014); *United States v. Ali*, No. PWG-13-3398, 2016 WL 8628348 (D. Md. Mar. 29, 2016), *aff'd*, *United States v. Ali*, 874 F.3d 825 (4th Cir. 2017).

[2] As of November 30, 2016, Ms. Ali contacted the following companies to obtain information or

case law, Ms. Ali was required to take "all reasonable steps" to produce the summonsed records.

*United States v. Darwin Const. Co.*, 873 F.2d 750, 755 (4th Cir. 1989).  Starting with the foreign

bank records, I asked Mr. Klimas, counsel for the Government, what reasonable steps it

contended that Ms. Ali should take to meet this standard.

> THE COURT: So you tell me all reasonable steps, what are the further reasonable steps on UBS that you contend that Ms. Ali or her counsel should have taken that they didn't.

> MR. KLIMAS: Yes, Your Honor.  As an initial matter, we don't know what steps she did take but, certainly, reasonable steps could include contacting UBS by letter, by phone, through an attorney, talking to family members who she believes might have a connection –

> THE COURT: Well, she did. . . .  So there was some effort to try and get them, right?

> MR. KLIMAS: Yes, if we --

> THE COURT: So tell me what more should have been done. . . .  So tell me now, with regard to the foreign bank accounts, including UBS, Credit Suisse, Deutsche Bank, what additional steps you believe would be required for me to be able to find that Ms. Ali had met the all reasonable steps test.

> MR. KLIMAS: Yes, Your Honor. With respect to the UBS account, Ms. Ali could have tried to contact the bank through family members, or she could have considered legal remedies.

> THE COURT: Like what?

> MR. KLIMAS: Such as filing a lawsuit against the bank, which is -- I believe it was contemplated by the 11th Circuit in its *Hayes* opinion, where the taxpayer flew overseas, contacted his business partner, asked for the records, was rebuffed, and did not bring suit against his business partner, did not take --

> THE COURT: Well, that's a business partner. That's not the bank. . . . [T]he 11th Circuit didn't say Hayes had to sue the bank, did they?

> MR. KLIMAS:  No, Your Honor.

> THE COURT: All right.  So tell me what you think Ms. Ali and her representatives should have done as to UBS and any other foreign bank account.

> MR. KLIMAS: If we look at the notes from Ms. Ali's attorney, what UBS said was that there were two signatures that were needed to access the account.  At a

minimum, we think that Ms. Ali should have tried to figure out who the second signature was by inquiring among her family members who may have had an interest in the ROMEIS Foundation. Beyond that, it's possible she could have taken legal recourse against her family members, depending on what information she found out. With respect to Deutsche Bank and Credit Suisse, there's no evidence that she even took the step of calling or writing a letter to those banks.

*Id.* at 48:4–51:3. In other words, at the hearing, the Government's counsel suggested that for the foreign bank records, reasonable steps could include Ms. Ali contacting the foreign banks herself or through family members, discussing the accounts with family members, and potentially filing legal action to obtain the records.

During the hearing I also asked the Government what reasonable steps it believed Ms. Ali should take with respect to the corporate records, limiting this category to three corporate entities – Deerwood, White Pearl Investment Company, and Richtree.

> THE COURT: And so talk to me about the other category, the corporate representational relationship, the Deerwood -- I'm going to limit it to . . . Deerwood, she had a power of attorney, at least back in -- when the house was purchased. . . . And then for White Pearl Investment Company and Richtree, where your submissions say that she was the secretary-treasurer of these corporations from between mid-1990's and 2013, tell me what you think would be evidence that would be equal to, in the judgment of the IRS, all reasonable efforts to produce the documents that I ordered produced regarding this category of documents.

> MR. KLIMAS: Yes, Your Honor. At a minimum, Ms. Ali would have to state under oath that she looked for the documents, whether in her own files or in the files of her agent, such as attorneys or accountants.

> THE COURT: Well, someone with some personal knowledge about where her documents are, right? Maybe her, maybe not her. The chance of her answering questions under oath at this point [-- it] seems like her lawyers have done a pretty good job of making sure she hasn't done that. I suppose she could always start at some point, if she doesn't want to be held in contempt, but she's got a right not to.

> So what other evidence -- regardless of who does it, what steps would have to be taken to meet this test, so I can figure out whether it's been met?

> MR. KLIMAS: Yes, Your Honor. In addition to looking in her own files or the

files of her agents, it might also be appropriate, because she says these entities are
controlled by her family, to contact her family members or people associated with
the entities to see whether they would give her the documents upon her asking.

*Id.* at 48:4–51:3.   In other words, the Government suggested that Ms. Ali, or someone with

sufficient knowledge, testify under oath that she looked for the documents.   The Government

also suggested that she contact her family members or people associated with the corporations to

see if they would give her any documents.

These suggestions by the Government were reasonable, and during the hearing I told the

parties that had Ms. Ali tried these things and failed, I may have been convinced that she used all

reasonable efforts to comply with the summons.   *Id.* at 55:19–24.   Thus, I issued a ruling from

the bench finding that Ms. Ali was in contempt of my previous Order with respect to documents

related to foreign bank accounts and the corporate entities Deerwood, White Pearl, and Richtree.

*Id.* at 67:21–68:6.   My ruling was memorialized in a separate Order.   ECF No. 51.   Ms. Ali was

ordered to purge herself of contempt by April 28, 2016 by using all reasonable efforts to produce

these documents or provide evidence that she is unable to do so.   *Id.*   If Ms. Ali did not purge

herself of contempt by that date, she was to pay monetary sanctions of $500 per day, payable

weekly, until she did.   *Id.*   The deadline for compliance with the summons without monetary

sanctions was extended to June 20, 2016.   ECF No. 56.

*Efforts to Comply with the Summons Prior to Monetary Sanctions*

Following the hearing and contempt order, Ms. Ali started a flurry of activity to comply

with the summons.   First, Ms. Ali abandoned her assertion of a Fifth Amendment privilege

against self-incrimination and provided a 122 paragraph declaration to the Government regarding

her knowledge of the requested documents.   ECF No. 80-2.   As to the foreign bank accounts, Ms.

Ali stated that the only foreign bank account that she was associated with to her knowledge was a UBS account in Switzerland. *Id.* at ¶ 7. Ms. Ali also provided information about the ROMEIS foundation, which owned the account at UBS Bank, and stated that she had in fact renounced all interest in the foundation's assets and provided supporting documentation. *See id.* at ¶¶ 44–63. Ms. Ali also included a description of efforts to obtain the documents to date. Despite stating that the only account she was aware of was the UBS account related to the ROMEIS Foundation, which she had renounced, Ms. Ali contacted UBS, Credit Suisse, and Deutsche Bank, to see if they had any responsive documents. *See id.* at ¶¶ 8, 26–29, 40–41, 70–72. When she did not receive responsive records, Ms. Ali sent subpoenas duces tecum to UBS, Credit Suisse, and Deutsche Bank. *See id.* at ¶¶ 30–33, 42–43, 73–74.

For the corporate records, Ms. Ali stated that as to Deerwood, she had no ownership or beneficial interest in the company, was appointed power of attorney for the purpose of handling real estate transactions, and had no compensation from the company. *Id.* at ¶¶ 76–78, 88. The Deerwood power of attorney and additional correspondence were produced to the IRS. *Id.* at ¶ 79. Ms. Ali also hired a private firm, BVICompanySearches.com, to provide information on Deerwood, the results of which were produced to the IRS. *See id.* at ¶¶ 92–93.

For Richtree and White Pearl Investment Company, Ms. Ali stated that she had a non-functioning board positions in both companies, and received no compensation from, made no investments in, and possessed no documents from either company. *See id.* at ¶¶ 94–98; 108–12. Ms. Ali also contacted Mr. Jonathan Feucht, an officer of Richtree and White Pearl, to obtain documents regarding those companies. *Id.* at ¶¶ 105, 119. Ms. Ali also sent a subpoena to Mr. Feucht for records related to Richtree and White Pearl, as well as their parent company, COW Holdings, Ltd. *Id.* at ¶¶ 107, 121, 122. The corporations and Mr. Feucht objected to the

subpoenas, stated that they "previously produced thousands of pages of documents to the IRS responsive to subpoenas which sought the same information," and threatened sanctions against Ms. Ali. *See* ECF No. 80-16. Nonetheless, Ms. Ali's lawyers and the IRS deposed Mr. Feucht on May 9, 2016. *See* ECF No. 80-17.

Ms. Ali also contacted family members for any information or records regarding the foreign bank accounts and corporations. *See* ECF No. 80-2 at ¶¶ 10–25.

In addition to providing a declaration, producing documents, sending subpoenas to all of the banks and corporate entities identified in my Order, and contacting family members, Ms. Ali also voluntarily sat for a deposition with the IRS on June 9, 2016. *See* ECF No. 80-3 (transcript of deposition). During that deposition, Ms. Ali disclosed the existence of several additional trusts that she had previously renounced her interest in. *See id.* at 103:13–116:6. For one of those renounced trusts, Ms. Ali stated that she received a check for approximately $400,000 but did not cash the check. *Id.* Following the deposition, the IRS requested additional documents about these trusts, which Ms. Ali provided on June 27, 2016. *See* ECF No. 80-4.

Despite these efforts, the Government took the position that Ms. Ali had not purged herself of contempt. Ms. Ali began paying the monetary penalty of $500 per day, and her efforts to produce documents continued.

*Continued Efforts After Sanctions Started*

To potentially locate documents within her constructive control, Ms. Ali hired a private investigation firm to search for bank accounts associated with her name in countries the IRS had mentioned, namely, Switzerland, Indonesia, Singapore, and Hong Kong. *See* ECF No. 80-18. The investigation did not find any accounts. *Id.* Ms. Ali continued to contact potential sources

of information identified by the Government and by reviewing documents.  Ms. Ali provided monthly updates to the Government about her efforts, what she had learned, and any documents she obtained.  *See* ECF No. 80-21 (updates from Ms. Ali's counsel to the IRS on 8/8/2016, 9/7/2016, 10/13/2016, 12/9/2016).

Throughout this process, Ms. Ali repeatedly asked the IRS for guidance on what steps it still wanted Ms. Ali to take to purge herself of contempt.  *See* ECF Nos. 80-21, 80-27, 80-29.  In response, the Government provided only general guidance, directing Ms. Ali to conduct an iterative investigation, following up on various leads as she comes across them to see if they yield any documents.  *See* ECF Nos. 80-22, 80-28.  The Government also continually threatened that it would move for additional sanctions or that the $500 per day sanctions were insufficient. *See* ECF Nos. 80-24, 80-28.

By November 30, 2016, Ms. Ali had attempted to obtain documents or information from approximately 50 different entities on three continents.[2]  *See* ECF No. 80 at 11. But the Government still was not satisfied and would not agree that Ms. Ali had purged her contempt.

---

[2] As of November 30, 2016, Ms. Ali contacted the following companies to obtain information or records: White Pearl Investment Company; Rim Pacific Management Inc.; Access Property Services; Cow Holdings Limited; Deerwood International Ltd.; Mossack Fonseca law firm in the British Virgin Islands; CitiTrust (Cayman) Limited; JP Morgan Chase Bank U.S.; JP Morgan Trust Company (Bahamas); JP Morgan Channel Islands; JP Morgan Chase Bank Switzerland; Deutsche Bank Switzerland; Deutsche Bank Indonesia; Deutsche Bank Liechtenstein; Deutsche Bank Singapore; HSBC Bank – U.S.; HSBC Bank – Singapore; HSBC Bank – Indonesia; Credit Suisse – Singapore; Credit Suisse – Switzerland; Credit Suisse – U.S.; Credit Suisse Liechtenstein; UBS AG Switzerland; UBS AG Singapore; UBS AG Indonesia; Citibank N.A. US; Citibank – Singapore; Citibank N.A. Indonesia; Citibank N.A. Liechtenstein; ABN Amro Bank NV – Singapore; ABN Amro Bank NV Hong Kong; ABN Amro Bank NV Indonesia; ABN Amro Bank NV Liechtenstein; Walkers BVI; O'Neal law firm; Ronald Walla; Diana Soetrisno; Sharon Santoso; Jean-Michel Gross; Janice Beazer; Paolo Flury; Daniel Kieber; Brigitte Feger; Rosemarie Flax; Marta Edghill; Imogene Wilson; and Vianca Scott.

*See* ECF No. 80-28.   Instead, the IRS said that Ms. Ali had not taken a sufficient "iterative approach," by, for example, not following up again with particular wealth managers or institutions, or using additional permutations of names to potentially find documents from banks. *Id.*   However, the Government declined again to provide more concrete guidance on what it wanted Ms. Ali to do.  *Id.*   Ms. Ali did not ask this Court to rule on whether she had purged her contempt.  So the search, and fines, continued.

In 2017 and 2018, Ms. Ali's provided additional information, documents, and periodic updates to the Government as her investigation persisted.  *See* ECF Nos. 80-29 (updates from Ms. Ali's counsel to IRS on 1/13/2017, 5/23/2017, 6/21/2017, 8/4/2017, 10/9/2017); 80-30 (updates from Ms. Ali's counsel to IRS on 1/19/2018, 6/19/2018).

Finally, on March 12, 2019, the parties filed a joint stipulation that Ms. Ali had purged herself of contempt no later than June 19, 2018.  ECF No. 77.  On March 20, 2019, I approved the stipulation.  ECF No. 78.  The delay between the agreed upon date that Ms. Ali purged her contempt and the filing of the joint stipulation was apparently due, in part, to the Government shutdown.  ECF No. 79 at 13–14.  Ms. Ali had continued to pay the sanctions until the week of March 20, 2019, when I approved the joint stipulation, thereby paying $98,000 in sanctions *after* the date the parties agreed she was no longer in contempt.  In total, Ms. Ali paid $486,500 in fines while in contempt.[3]  Ms. Ali also states that her investigation to comply with the summons cost her hundreds of thousands of dollars.  *Id.* at 2.

---

[3] The docket shows receipt by the Clerk of the Court of 121 checks of $3,500 each, totaling $423,500.  Ms. Ali states that all receipts are not reflected on the docket, and that she submitted a check for each week of the 142-week period between June 24, 2016 and March 20, 2019, totaling $497,000.  The Clerk of the Court has confirmed that not all receipts appear on the docket.  However, the Clerk received 139 checks of $3,500 each, for a total of $486,500 paid by Ms. Ali.

After I approved the joint stipulation, Ms. Ali filed the pending Motion for Release of Funds.  ECF No. 79.  Ms. Ali requests that the Court return of all the monetary sanctions that she paid from June 2016 to March 2019 on the basis that she purged her contempt before the sanctions started, and at the very least to return the $98,000 she paid after June 19, 2018, the date the parties agreed she was not in contempt.

### Discussion

To begin, the parties agreed in their joint stipulation, which I approved, that Ms. Ali purged her contempt by June 19, 2018.  ECF Nos. 77, 78.  Therefore all of the payment she made after that date, totaling $98,000, will be returned to Ms. Ali.

For the payments made prior to this date, the relevant legal question is whether, consistent with my Order, Ms. Ali made "in good faith all reasonable efforts to comply with [the summons]" before the contempt sanctions started.  *United States v. Darwin Const. Co.*, 873 F.2d 750, 754–55 (4th Cir. 1989) (quoting *United States v. Ryan*, 402 U.S. 530, 534 (1971) (internal quotation marks omitted).  This required Ms. Ali to take "all reasonable steps . . . to ensure compliance."  *Id.* at 755 (internal quotation marks omitted).  While this standard does not require perfect compliance, "inadvertent omissions are excused only if such steps were taken."  *Id.*

Comparing Ms. Ali's efforts with the activities discussed during the contempt hearing and existing case law, I find that Ms. Ali had purged herself of contempt prior to the commencement of the civil fines.

First, as discussed above, the Government suggested several steps that Ms. Ali should take to satisfy the "all reasonable steps" standard and comply with the summons.  Specifically, the Government suggested that Ms. Ali contact her family members and individuals known to be

associated with the accounts, that she or someone else testify regarding the existence of the documents, and to potentially use legal process to obtain the documents.  I agreed that these steps were reasonable and stated that had Ms. Ali done these things prior to the contempt hearing, I may have found that she could not produce any of the requested records and had satisfied the summons.  Ms. Ali did all this and more.  She hired a private investigation firm to obtain information, submitted a sworn declaration, sat for a deposition, contacted the banks and corporate entities discussed in the hearing and requested documents, and sent subpoenas to each of them when she did not receive any documents.  In other words, she completed all of the things that either the Government or the Court discussed during the contempt hearing and went further than that to obtain the documents.

Second, during the hearing and in my Order, I cited *United States v. Darwin Constr. Co.*, 873 F.2d 750 (4th Cir. 1989), *United States v. Hayes*, 722 F.2d 723 (11th Cir. 1984), and *United States v. Plath*, No. 03-60439-Civ., 2003 WL 23138778 (S.D. Fla. Oct. 29, 2003), in finding that Ms. Ali had not in good faith used all reasonable efforts to comply with the summons.  *See* ECF No. 51 at 2–3l; ECF No. 52 at 55:25–60:23.  These cases are instructive as to what is required by the "all reasonable efforts" standard.

In *Darwin*, the IRS served a summons on Lester J. Robinson demanding that Darwin Construction Company produce documents related to twenty-five categories of business records and all records pertaining to the corporation from 1980 to 1983.  *United States v. Darwin Const. Co.*, 873 F.2d 750, 751 (4th Cir. 1989).  Like in this case, Robinson first refused to produce documents, citing his Fifth Amendment privilege against self-incrimination.  *Id.*  The IRS petitioned the District Court for Darwin to produce the documents, and, following a show cause hearing, the Court ordered Darwin to comply with the summons.  *Id.* at 752.  But Darwin

produced documents in only two of the twenty-five categories. *Id.* On June 23, 1986, the District Court held another hearing and found that Darwin had not adequately explained why it failed to produce the documents. *Id.* It held Darwin in civil contempt and ordered it to pay $5,000 per day until it complied with the summons. *Id.*

The sanctions spurred Darwin into action, and, on June 24, 1986, Darwin delivered nine boxes of documents to the IRS. *Id.* However, the IRS found that documents were still missing in twelve of the twenty-five categories. *Id.* After another search of the office, Darwin produced additional documents on June 30, 1986. *Id.* The District Court assessed $30,000 in sanctions for the six days between June 24 and June 30, 1986. *Id.* at 753. Darwin appealed.

The Fourth Circuit affirmed, finding that the District Court did not hold Darwin to a standard of "perfect compliance," only "good faith substantial compliance*." Id.* at 754. The Fourth Circuit noted that as to the six-day lag between the productions on June 24 and June 30, "Darwin had not asserted that the documents missing from the June 24 production were beyond its possession or control, and second, Darwin had made no special effort to ensure that the June 24 production was complete." *Id.* The Fourth Circuit also noted that the District Court found Darwin "was both ignorant of and apparently unconcerned about the contents of the nine boxes of documents dumped in the IRS office on June 24." *Id.* at 755. Accordingly, it found that Darwin "did not take 'all reasonable efforts' to comply with the court order" prior to June 30. *Id.*[4]

In *Hayes*, the IRS served John Hayes with two summons regarding tax shelters sold and

---

[4] The Fourth Circuit did reduce the fine by $10,000 for two business holidays (Saturday and Sunday) during the period that the District Court imposed the fine. *United States v. Darwin Const. Co.*, 873 F.2d at 756–57.

managed by Hayes.  *United States v. Hayes*, 722 F.2d 723, 724 (11th Cir. 1984).  Hayes partially

complied with the summons, but did not provide information related to foreign partnership

agreements.  *Id.*  Hayes had created the relevant partnerships with Frederick Thom, a Swiss

resident, who also served as the managing partner.  *Id.*  The District Court held a contempt

hearing regarding the failure to produce the foreign partnership documents, during which Hayes

testified that the records were in Switzerland, that he had traveled there twice to request them

from Thom, and that Thom refused to produce them because of concern over a separate tax

investigation.  *Id.*  The District Court declined to hold Hayes in contempt, finding that "it was not

proven that Hayes had or has any legal means of forcing Frederick Thom to produce documents .

. ." and that Hayes "made some effort to comply with the summons."  *Id.* at 724–25 (internal

quotation marks omitted).

The Eleventh Circuit vacated the judgment and remanded back to the District Court,

finding that the District Court failed to apply the correct "all reasonable efforts" standard in favor

of a "some efforts" standard.  *Id.* at 726.  The Eleventh Circuit further held that Hayes did not

make all reasonable efforts to produce the documents.  *Id.*  It explained:

> While Hayes may have been diligent in going to Switzerland to ask Thom for the
> documents, the record of the contempt hearing clearly indicates that other avenues
> for obtaining the material were never explored.  Following Thom's refusal, Hayes
> did not take any steps pursuant to the partnership agreements to either remove
> Thom as manager or otherwise compel disclosure.  Hayes apparently did not
> even try to determine what legal rights he, as trustee, had against Thom under the
> partnership contracts, nor did he consult with an attorney about the problem.
> When asked if he had ever told Thom that he would take steps to see that the
> documents were released, Hayes emphatically replied that he had not.  Hayes'
> failure to do anything other than ask Thom for the records demonstrates that "all
> reasonable efforts" were not made.

*Id.* at 725–26.  In other words, Hayes traveled to Switzerland but did nothing more than ask

Thom to produce the records and did not even consider what legal rights or action he could take

as a trustee against his partner or consult an attorney on the issue.

In *Plath*, the IRS issued two summonses to Robert and Beverly Plath to produce documents related to foreign bank accounts, foreign bank cards, and a business called 1120 Eiffel Design. *United States v. Plath*, No. 03-60439-CIV., 2003 WL 23138778, at *2 (S.D. Fla. Oct. 29, 2003). After the Plaths failed to respond, the District Court entered an order directing the Plaths to appear and testify before the IRS and produce the summonsed documents. *Id.* The Plaths appeared, but did not produce any documents or testify. *Id.* The court held a contempt hearing. *Id.* At the time of the hearing, the Plaths had only produced one document: a copy of the sales agreement for the business 1120 Eiffel Design, Inc. During the hearing, Robert Plath testified that he did not possess any of the records requested in the summons. *Id.* at *3. He also said that he did not make any efforts to obtain documents relating to foreign accounts or cards because he did not know who to contact. *Id.* However, the Government testified that Robert Plath was linked via a credit card statement to an entity called the Leadenhall Trust.

Based on this record, the court found that the Plaths had not made all reasonable efforts to produce the summonsed documents, holding them in contempt. It summarized:

> Plath explained to the Court that he has not complied with the Summons because he does not possess the documents. Plath has not, however, adequately demonstrated to the Court that he has taken all reasonable efforts to comply with the Summons. In fact, the only effort taken by Robert Plath to comply with the Summons was his contact with a law firm to request one item listed in the Summons, the Eiffel Design sales agreement. The evidence indicates that Plath received a package purchased on the Leadenhall Trust account, and thus he had some knowledge of the offshore account at Leadenhall Trust. Yet, Plath failed to use any efforts to contact Leadenhall Trust to obtain the necessary documentation. Accordingly, the Court finds that Plath has failed to meet the substantial and rigorous burden of showing that he has made "all reasonable effort to comply."

*Id.* In other words, Plath had only contacted his attorney to produce one document and did not use any other efforts to reach out to known entities to produce records.

The lassitude of Ms. Ali's efforts before I found her in contempt were much like the efforts of the respondents in *Darwin*, *Hayes*, and *Plath*. She had refused to produce documents and did not testify, nor did someone else testify, regarding her knowledge of the summonsed documents. In short, Ms. Ali had exhibited very little effort, let alone "all reasonable efforts," to produce the summonsed documents. On this basis, I found Ms. Ali in contempt. *See* ECF Nos. 51 at 2–3; 52 at 67:21–68:20.

But Ms. Ali's efforts to comply with the summons after I found her in contempt and prior to the start of monetary sanctions far exceed the types of activities that were found lacking by the courts in *Darwin*, *Hayes*, and *Plath*. In *Darwin*, the civil contempt sanctions ended six days after they started when Darwin went back to its office a second time to produce documents. Here Ms. Ali conducted an international investigation, hired a private investigation firm, submitted a declaration stating her knowledge of the documents, sat for a deposition, and produced additional documents regarding renounced accounts that were requested by the Government.[5] In *Hayes*, the Eleventh Circuit found that Hayes only asked his partner for the documents, but did not even consider any legal recourse to obtain them. Here Ms. Ali issued subpoenas duces tecum to each of the companies discussed in my Order, and took the deposition, with the IRS, of a corporate officer of two of the companies. In *Plath*, the Plaths did not follow up on any leads to locate documents or reach out to any known entities to produce documents. Here, as discussed, Ms. Ali incurred substantial expense, and hired a private investigation firm, sent subpoenas to the relevant banks and corporate entities, and contacted representatives of those entities and members of her family to locate documents and information. In short, Ms. Ali's activities to

---

[5] Ms. Ali produced documents requested by the Government in the deposition on June 27, 2016. While this is a week after the date monetary sanctions started, the delay in producing these additional documents – or, as discussed above, any other additional documents – does not preclude the finding that Ms. Ali had purged herself of contempt by June 20, 2016.

comply with the IRS summons far surpass the things that constituted a failure to expend all reasonable efforts in these cases.

The Government argues that Ms. Ali did not take all reasonable steps prior to the start of sanctions, because she continued to produce documents for the next two years.  ECF No. 83 at 9–10.  But these additional documents were produced after Ms. Ali spent hundreds of thousands of dollars in private investigators and lawyers fees to search for documents around the world that she had no knowledge about.  Her efforts over this period go far beyond the "all reasonable efforts" required for Ms. Ali to purge herself of contempt.  The fact that she located additional documents with extraordinary effort is perfectly consistent with the conclusion that she purged herself of contempt after expending reasonable efforts to comply with the summons.

The Government also argues that Ms. Ali did not purge herself of contempt prior to June 18, 2019 because there were additional names and accounts at each point that Ms. Ali could have contacted to obtain documents before then.  *Id.*  But this argument is hardly credible, given that at no point in the years leading up to June 18, 2019 did the Government agree that Ms. Ali purged herself of contempt, taking the position that there was always "more" that she could do. This includes, for example, in November 2016 when the Government declined to agree that Ms. Ali purged herself of contempt after she had contacted over 50 different entities on three continents to locate documents she already testified that she knew nothing about.  Moreover, the Government provides no case, and I have not found any, in which a court held that the type of effort that Ms. Ali expended here did not constitute "all reasonable efforts" to comply with an IRS summons.  Therefore, the Government's arguments are unavailing.

Given that Ms. Ali met the standard for "all reasonable efforts" to comply with the IRS summons prior to the commencement of sanctions on June 20, 2016, all of the civil contempt fines that she paid will be returned to her.

### Conclusion

For the reasons discussed above, Ms. Ali purged herself of contempt prior to the commencement of civil monetary fines on June 20, 2016.   Accordingly, the Clerk will be directed to reimburse Ms. Ali in the amount of $486,500.

### <u>ORDER</u>

For the reasons stated in this Memorandum Opinion and Order, it is, this 16th day of April 2020, hereby ORDERED that

1.  Respondents' Motion for Release of Funds, ECF No. 79, is GRANTED;

2.  The CLERK is directed to reimburse Respondent in the amount of $486,500.

3.  This case will remain CLOSED.


                     _____/S/_____
                     Paul W. Grimm
                     United States District Judge